The opinion of the court was delivered by
Watkins, J.
The defendant corporation is sued for damages for personal injuries sustained by the plaintiff by reason of his having been violently ejected from a passenger train on its road about twenty miles east of the city of Shreveport, at about 9 o’clock on the night of November 10, 1888.
Claim is made for $20,000, but on the trial the jury awarded $7500, and from a judgment to that effect' the defendant has appealed.
The defence is a general denial, and a plea of compromise and payment.
As admitted by the defendant’s counsel, in brief and argument, the facts developed on the trial, i. e., in relation to the happening of the occurrence, are briefly these:
On the night in question the plaintiff was a passenger on one of the defendant’s excursion trains going east from Shreveport. Nine passenger coaches and one baggage car composed the train. On this train were a large number of people — men, women and children — returning to their homes from their attendance on the Shreveport fair. The plaintiff while sitting on one of the steps of the rear platform of the fourth coach from the engine was approached by some one, who demanded his fare. He did not have his ticket in possession, but told this person that a gentleman on the train had his ticket, and asked time to get it. Thereupon this man pushed or shoved him off the train. The speed of the train was about twenty-five miles an hour; and by the fall the plaintiff’s left leg was broken. He lay all night by the roadside, and was next day found and carried to the Charity Hospital in Shreveport, whereat his broken leg was amputated two days subsequently.
Defendant’s counsel makes no question of the fact that a gross and wanton outrage was perpetrated on the plaintiff by somebody, but he strenuously insists that the person who inflicted it was neither an officer or employé of the company, and it is therefore in no way responsible for the injury inflicted or the damages sustained.
*1000 But whatever may be the- facts in the case as appertaining to its liability, he claims — and defendant’s answer sets up — a compromise and settlement made with the plaintiff pendente lite as a bar to his demands and recovery of damages.
Hence the defence is twofold: (1) A compromise and settlement; (2) a denial of defendant’s responsibility for the unlawful act.
I.
Of the Effect of ti-ie Compromise.
On December 29, 1888, this suit was filed, and on the 26th of June, 1889, the subjoined document was executed by the plaintiff, viz:
“Form 1516.
“ Vicksburg, Shreveport and Pacific Railroad Company to Wm.

Lampkins, Dr.

“ Shiloh, La., June 26, 1889.
“ On consideration of the sum of $150 to me paid by the Vicksburg, Shreveport & Pacific Railway Company, the receipt whereof is hereby acknowledged, I hereby release and acquit said company of all claims by reason of injuries sustained by me west of and near Shreveport on the 10th day of November, A. D. 1888, by jumping from train and having leg run over, the same being settlement in full of any and all claims I have against said company in consequence of, or in any way connected with, said injury, whether caused by negligence of said company or any of its employés. One hundred to be paid in cash down, and fifty dollars to be- remitted to me on or before July 5, 1889.
(Signed) “ Wm. Lampkins.
“ Witness to reading, signature and payment
(Signed) “ W. F. Lindsay.”
This is the document relied upon as a compromise, having the force of things adjudged, between the parties to the litigation.
From the evidence it appears that this alleged transaction was negotiated by an agent or claim adjustor of the defendant. This agent sought the defendant at- his residence near the village of Shiloh in Union parish, several miles distant from the railroad, and about eighty miles distant from Shreveport, where this suit was filed, and he found Mm in Ms house confined of his affliction. He *1001 then had a conversation with him about the accident, in the course of which he admits saying that “ he thought it would cost the company something like $100; that is to bring the men here. I told Lampkin they expected him with their witnesses when the ease came up, and that both of the conductors would be there for the purpose of proving they were not the men who shoved him off the train, and establishing their innocence. * * * * * , My whole object was to convince Lampkins that he could recover nothing in this suit.”
It is a noticeable feature of this instrument of writing that it contains no mention of the lawsuit that was to be compromised; and that while the consideration is mentioned as $150, only $100 of this is specified as cash.
The code declares that “ a transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.” R. ■€. O. 3071.
“.This contract must be reduced to writing.”
As a contract it must, like all other contracts, be full and complete in itself; but, in respect to the particular lawsuit to be compromised, this one is silent; and, as to the price agreed on, something was left to be done. For, it is in proof that, when the time designated in the instrument, for the payment of the deferred instalment of the price, had arrived, that amount was tendered to and refused by the plaintiff. It is evident that there was no perfect agreement, and the contract was incomplete. And soon afterward we find Lampkins and a companion journeying to Monroe — the domicil of the company — seeking additional advice on the subject, and endeavoring to procure some more definite satisfaction in the premises.
The code provides that “a compromise entered into on documents which have since been found false, is null in tofo.” R. C. C. 3081. It is likewise null if the contract was imperfect and the terms misunderstood. To be valid as a transaction this contract must be complete in itself, and nothing left to be established by parol proof. This case differs essentially from Calhoun vs. Law, 39 An. 594.
Just prior to the filing of this suit the following agreement was made and entered into between the plaintiff and his counsel, viz:
*1002 “ WM. LAMPKINS versus V., S. & P. R. R. 00.
“No. 3334. In Bistrict Court of Parish of Bossier.
“Know all men by these presents, that I, ¥m. Lampkins, having retained and employed the law firm of Land & Land to institute and prosecute to final judgment the above entitled suit for the recovery of damages against the said company for irreparable injuries inflicted upon my person, do hereby as a further consideration of their services in said suit renounce and waive my right to compromise said suit with said company, or to compromise the judgment that may be rendered in my favor in said suit; and I do hereby constitute my said attorneys my special and exclusive agents to-compromise said suit with said company, or to. compromise any judgment which may be rendered in my favor against said company for damages for injuries inflicted on my person, provided any proposition of compromise should be made by said company, either before or after judgment. Done and signed this the 27th day of December, 1888.
(Signed) “ William Lampkins.”
On the trial of the case plaintiff urged this agreement in restraint of his right to make the compromise of the suit without first consulting his counsel. There is no doubt that, having employed counsel to bring the suit, it was the duty of plaintiff to first consult them before making any compromise of the case. And no written contract between them was necessary to consecrate this obligation. The plaintiff being a young colored man, at the time suffering from the amputation of his leg and under treatment, and not of a bright or intelligent mind, did not appreciate this obligation, and was unmindful of it. Some six months after the suit was filed and much of the written evidence had been taken, plaintiff’s counsel served a copy of this agreement on defendant’s counsel, that they might be fully apprised of plaintiff’s agreement and renunciation of his right to compromise the suit. This notification was brought home to the claim agent just previous to the alleged compromise. He admitted his knowledge of it, and that he disregarded it and gave plaintiff’s counsel no notice of it. To say the least, this course of conduct was in exceedingly bad taste, and reprehensible in the extreme, and places the transaction in a doubtful light. We think it was altogether unjustifiable and can not receive our approbation. .If reputable at *1003 tomeys who engage in the prosecution of justifiable litigation, at great labor'and expense, are to have themselves thus superseded and their cases turned out of court by over-zealous representatives of adverse parties, at any time and without notice, and have no redress — to borrow a Shakespearian phrase: “Othello’s occupation’s gone.” Coming in this doubtful guise, we cannot enforce this alleged compromise. On the trial, and in open court, plaintiff’s counsel tendered the defendant the sum of $150, and by receiving it the status quo would have been restored.
II.
With regard to the identity of the person who shoved the plaintiff off the train- the principal controversy arises. Quite a number of witnesses were interrogated on the subject, and, as is usual in such eases, there is a marked conflict of testimony. It is certain that plaintiff was approached by some one purporting to be a conductor, who demanded his fare. Lampkins says that this person wore a cap, he thinks, and had a lantern in his hand and a pair of clippers. It was he who pushed him off the train. He said: “The man had on a cap, but as to the clothes I do not remember. I did not notice whether the man had brass buttons on his coat or not. It was tolerably light; the lantern was all the light I had to go by.”
On the platform of the ear and quite near Lampkins stood^two other persons, who were eye witnesses of the whole transaction. One of them testified as follows:
“ I saw the conductor coming through the coach taking up fares.. He passed through the third coach from the engine; came out on the platform where I was standing and collected fare, twenty-five cents from me and John Horton; he (the conductor) went to Lampkins and asked him for his fare, and he told him hp did not have any fare; that there was a man in the cars that had his fare; that if he would allow him a little time, he would get his ticket; he asked him about the third time for his fare, and then told him: ‘ Get off here, then,’ and Lampkins seemed not to move. ’ The conductor took his lantern off his arm and set it on the platform of the car beside him, and then pushed and kicked him off. I and John Horton were standing there, and I said: ‘iThere, now, boss; you killed that man.’ The *1004 conductor said: ‘No; that did not hurt (the) d-s-b-.’ ”
This witness further stated that the conductor went into the next car, taking up tickets, and soon afterward returned and asked him: “Do you reckon I hurt the d-s-b ?” and he replied: “I reckon so.” He said this man wore a cap and carried a lantern, and had a pair of cor-ductor’s clippers in his hand.
This witness’ testimony is fully corroborated by that of his associate, who stood on the platform. The testimony of the plaintiff is to the same effect. Another witness testified that “ a short while after leaving Shreveport the conductor and porter came through the train saying that ‘ we have put him off; we have never failed yet.’ ”
Still another witness swears that he heard the conductor say he put Lampkins off the train. He subsequently modified the statement by saying he did know who it was made this remark.
The defendant’s witnesses testified that the two conductors who had charge of the train were not dressed in uniform, and the two -conductors declared that they had neither punches nor clippers; and -only one of them admitted that he carried a lantern. Other witnesses state that there was a party of four or five college cadets on the train, disguised as conductors, taking up fares from colored passengers.
One of these witnesses swears that he saw these young men collecting fares from colored men that night. He says: “ One of them handed me a pair of green spectacles, and asked me to keep them so the conductor would not recognize him.” He said he knew the 'youngman, and that he showed him the tickets he had taken up.
He says he went forward to the baggage car and informed the conductor of their proceedings, an! they came back through the train in search of the young men, but they failed to find them. But neither he nor the conductor state that he gave their names. This gentleman was a local agent of the defendant, and well known to the conductor.
On the other hand, five witnesses of the plaintiff, all of whom were on the same coach with the plaintiff, state that they saw nothing of the kind. This witness of the defendant fails to connect those young men with the plaintiff in any way. The details of the occurrence, as related by the eye witnesses, clearly show that the plaintiff was not pushed off the train by any one of them. The man who *1005 pushed him off carried a lantern and a pair of conductor’s clippers. He was entirely clone. , They saw him as he came through the car collecting fares of the passengers. -He then came out on the platform and took up their fares, and called on the plaintiff for his. Afterward he passed on into the next coach, and subsequently returned. He did not wear green spectacles. Neither of those cadets had a lantern or a conductor’s clippers. Itwas quite dark when the train left Shreveport, and at 9 o’clock no one could see how to read a ticket out on the platform of the coach where the plaintiff was sitting that night, without the use of a lantern. Certainly, the appearance of four or five young men on the train taking up fares from the passengers would haüe attracted general attention, and the defendant' could have easily proven that fact, if it was a fact, by many witnesses, whereas he produced but one. It is hard to believe that any young cadet would have pushed the plaintiff off the train in the manner described, just for the sake of a little sport — taking into consideration that the night was dark and he was entirely alone. If, as stated, these five young men went through the train and collected tickets from colored passengers; before the conductor came into the coach, how was it that there were not a number of persons besides the plaintiff ejected from the train for failing to have their tickets? And, if this occurred after the conductor had passed through the train, how did it happen that passengers had tickets in their possession, as they were on their return trip home?
Taking this statement in any light we may, and it appears utterly absurd. We feel convinced, from a careful perusal of all the evidence, that plaintiff was ejected from the train by an official or employs of the defendant, and that it is responsible to the plaintiff for the injury sustained by the loss of his leg, which was caused either by his fall from the train or by the wheels of the cars passing over and crushing it.
The plaintiff is a young colored man, of twenty-four years of age. He has no money or property. Is a laboring man who would likely earn $200 ayear, and has a reasonable prospect of living twenty-ñve years. He makes claim for $5000 for physical pain and suffering, $10,000 for the loss of his leg, and $5000 for punitory damages for a malicious and careless act of the defendant’s employé in pushing him off the train.
*1006 After being pushed off the train he lay on the ground, without assistance, from 9 P. m. of one evening until 8 a. ji. of the following morning, when he was found by one of the persons who stood on the platform and saw him fall. The next day he was carried to the Charity Hospital at Shreveport, where his left leg was amputated two inches below the knee. He was under treatment for several months, and suffered great pain. Under these circumstances we think he is entitled to the sum of $4500; of this amount $2500 for the pecuniary damages sustained in consequence of the loss of his leg, and $2000 for physical suffering, with legal interest from date of this decision.
There are numerous elements of damages that have entered into our computation and assessment of the allowance which we have made, and which need not be mentioned here. But it is proper to observe that this case was tried before a jury who knew all the witnesses, and gave consideration to their testimony, which is conflicting and contradictory. They saw the witnesses when they testified, and were better capacitated to place a just estimate upon their evidence than we are; and we regard their appreciation of it as justly entitled to great consideration at our hands, and consider that their verdict should not be lightly considered or hastily disturbed. In this case we find no warrant for reversing their conclusions. Griffin vs. Railroad Company, 41 An. 808.
It is therefore ordered, adjudged and decreed that the judgment appealed from be and the same is amended and reduced to $4500, and that, as thus amended, same be affirmed, and that the plaintiff and appellee be taxed with the costs of the appeal.